FRED D. HUFFMAN, Plaintiff in Error, v. STATE OF TENNESSEE, Defendant in Error.

458 S.W.2d 29.

Court of Criminal Appeals of Tennessee. March 6, 1970.

Certiorari Denied by Supreme Court July 6, 1970.

George H. Garrett, Kingsport, for plaintiff in error.

David M. Pack, Atty. Gen., Lance D. Evans, Asst. Atty. Gen., Nashville, Carl K. Kirkpatrick, Dist. Atty. Gen., Blountville, for defendant in error.

## OPINION

RUSSELL, Judge.

The defendant below, Fred D. Huffman, was convicted of armed robbery and assault with the intent to commit murder and sentenced to concurrent penitentiary terms of thirty and three to fifteen years.

The assignments of error require a determination of the sufficiency of the evidence and whether or not reversible error was committed in allowing the introduction into evidence of a wrist watch found in a search of Huffman's car. We shall, therefore, detail the evidence.

The victim of these alleged crimes was one Paul Hammonds, a house painter living in Kingsport. On the evening of May 20, 1968, he went to a rooming house and tavern in Kingsport run by one Doug Grogg, arriving sometime between 8:00 and 8:30 P.M. He had been there on other occasions. He drank some beer and talked with another patron, Don Pickles. The defendant, who was unknown to the victim at that time, entered the

place and also drank some beer. The defendant struck up a conversation with the victim, and invited him to ride out to Roy Salyer's place (apparently the place of a bootlegger) in defendant's car. The victim, Hammonds, agreed; and they left in defendant Huffman's Ford Falcon automobile, leaving the victim's truck parked outside Grogg's place. This was sometime before 9:00 P.M.

When they arrived at Salyer's place there were no lights burning, so they did not stop. The defendant continued to drive on, finally pulling off onto a dirt road and driving to a hilltop area that had been used as a "lover's lane" type parking area. There the defendant got out of the car, went around to the victim's side of the car, pulled a gun on Hammonds and ordered him to empty his pockets. Defendant began punching Hammonds with the gun, as he took from him the contents of his pockets and his wrist watch. He told Hammonds that he was going to have to kill him. He forced the victim to lie down on the ground, continually punching on him with the gun; and would make him get up and take off an item of clothing and lie back down until finally Hammonds was naked. The defendant told Hammonds that he was going to have to kill him for the "organization." Hammonds lunged for the gun, was hit and knocked down, and was then shot in the neck. After the defendant left, Hammonds managed to travel to a not too distant residence emitting a light. The police were summoned and the victim hospitalized.

Hammonds positively identified the defendant as being the man who robbed and shot him. Doug Grogg, who knew both men, testified that they left his place together sometime before 9:00 P.M. Iva Nell Smith, an acquaint-

ance of defendant's, testified that she was at Roy Salyer's around the first of June, and that the defendant was there and sought her out and asked her if she had heard about him shooting Paul Hammonds, and further said, "I wished I had of killed him."

The defendant did not testify. He presented through family witnesses an alibi defense. His stepsister, Brenda Bethany, said that between 8:00 and 8:30 P.M. on the night of the crime she was looking out of her bedroom window and saw the defendant in his car parked in the street talking to her mother. This was at 919 East Sullivan in Kingsport. His wife, Shirley Huffman, testified that on the night in question the defendant picked her up at her place of work at Boney's Restaurant in Kingsport, arriving there at 9:00 P.M. and taking her home at 9:15 P.M. Blanche Roberta Ball, apparently the aunt of defendant's wife, and who lived in the same house with defendant and his wife, testified that they arrived home at 9:35 P.M., ate supper and went to bed. Mrs. Margie Jeffcoat, grandmother of defendant's wife, and the apparent head of the house where they were living, testified that they got home at 9:35 P.M. The final defense witness, Edith Clark, was the records clerk at the hospital to which the victim was admitted. The hospital record showed that he was seen in the emergency room at 10:40 P.M. and admitted to the hospital at 11:45 P.M., the first time being possibly an approximation.

 It is obvious that the jury rejected such of the alibi testimony as conflicted with the State's proof. Certainly it cannot be said that the evidence preponderates

against the verdict of guilty and in favor of the innocence of the defendant.

The controlling question in this case is whether or not reversible error was committed in the admission into evidence of a wrist watch, said to have been the victim's, taken from a hiding place in defendant's car during the course of a search by four investigating officers. A motion to suppress this evidence was duly made, a hearing held thereon, and the objection to the evidence overruled.

It appears that after the defendant was arrested and charged and was apparently out on bond that a search warrant was obtained for the purpose of searching the premises where he lived for "a small calibre pistol." This warrant describes the premises to be searched as "229 Cypress Street, Route 3, Church Hill, Tennessee—small frame house, all outbuildings and cars." This warrant is stipulated to be invalid, and was so considered to be by the trial judge.

Four officers carried the warrant to the premises. The defendant was there, and his locked car was parked on the road in front of the house and outside the yard fence. At least three of the officers were in uniform. Mrs. Jeffcoat, the lady of the house (and grandmother of defendant's wife), went to the door. She was told that they had a search warrant, was presented with a copy of it, and she told them to "go ahead and search." She was told that they were looking for a gun and a watch. The defendant, who was present, then (according to the officers) stood up and said, "Well, here, search me while you're at it." He then took his car keys out of his pocket

and threw them down and said, "You might as well search my car out there while you're at it, so you won't bother me when I get up in Sullivan County." Officer Vance testified that two or three times the defendant help up the car keys and said, "You can search the car outside if you want to." The search of the house was fruitless. The officers did not want to search the defendant. When they left the house the defendant went out, unlocked the front door of the car and the trunk, and stood there while the officers searched the car. It is not clear whether he was ever asked to unlock the car. Officer Bishop found the 17 jewel Waltham wrist watch, without a band, secreted beneath the instrument panel.

The defendant testified on a motion to suppress, and said that the officers advised that they had a search warrant "for out-buildings and cars," and that he looked at the warrant. He said that he offered them the keys, because he didn't know whether they'd want to open the car or have him do so. The thrust of his testimony is that what he did was what he thought he had to do.

▆ The court held that the defendant voluntarily waived his right not to have his car searched. With this we cannot agree. This search was under color of an invalid warrant. The officers even made a return upon the warrant as to what was found in the car.

The U. S. Supreme Court, in the recent case of Bumper v. North Carolina, 391 U. S. 543, 88 S.Ct. 1788, 20 L.E.2d 797, said this:

"The issue thus presented is whether a search can be justified as lawful on the basis of consent when that 'consent' has been given only after the official conduct-

ing the search has asserted that he possesses a warrant. *We hold that there can be no consent under such circumstances.* (Emphasis added.)

"When a prosecutor seeks to rely upon consent to justify the lawfulness of search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. *A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid.* (Emphasis supplied.) The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.

"When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. *The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.*" (Emphasis supplied.)

The validity of this search being a federal constitutional question, it is clearly controlled by this late United States Supreme Court case, and makes a further analysis of authorities unnecessary. We might add that our Supreme Court of Tennessee has followed the same rule in Fox v. State, 214 Tenn. 694, 383 S.W.2d 25, saying that such consent is an act of necessity rather than of free volition. To the same effect is Hampton v. State, 148 Tenn. 155, 252 S.W. 1007.

We are next faced with the proposition of whether or

not the error in the admission into evidence of the wrist watch taken from the defendant's car in the illegal search requires a reversal. We must, therefore, first determine whether or not in our judgment this evidence contributed to the verdict of guilty. If so, a reversal must follow.

Other evidence of guilt is overwhelming. The victim of the robbery and attempted murder, who had been with the defendant for a considerable time both in a friendly social atmosphere and under the stress of the crime, was unequivocal in his identification. The proprietor of the tavern where the victim and defendant got together, and who was previously acquainted and friendly with both men, positively identified the defendant as being the man with whom the victim left his place. The lady friend of the defendant testified that he admitted the crime to her, and her testimony is unimpeached. Contrasted with this, the evidence with regard to the watch was quite weak. The victim identified the watch taken from defendant's car as his because of a minute scratch on the crystal and perhaps some paint residue thereon, and not by a serial number or in any other positive way. Excluding the watch from consideration, in the light of the total other evidence in the case we feel that the jury would have acted arbitrarily not to have convicted the defendant.

We are faced then with the question of whether or not error in the admission of evidence obtained in violation of the constitutional protection against unreasonable searches and seizures can be deemed harmless error.

We find statements in many Tennessee cases to the

effect that constitutional error can never be harmless; but a painstaking review of our case law on the point does not support this proposition blanketly. As will be pointed out subsequently in this opinion, the U. S. Supreme Court gives no such per se harmful status to constitutional error.

The harmless error doctrine is grounded in court rule, state statute, and state and federal court decisions. Rule 14(6) of the Tennessee Supreme Court, duly adopted as a rule of this court, says:

> *"Reversal only for prejudicial error.*—No assignment of error in any cause can be based upon any error or errors appearing in the judgment or decree of the inferior court unless it affirmatively appears that the same were prejudicial to the rights of the appellant, or plaintiff-in-error, and did affect the merits of the judgment or decree of that court."

The pertinent statute law of Tennessee reads as follows:

> *"T.C.A. § 27-117. Technical errors affecting result.*— No verdict or judgment shall be set aside or new trial granted by any appellate court, in any civil or criminal case, on the ground of error in the charge of the judge to the jury, or on the ground of the improper admission or rejection of evidence, or for error in acting on any pleading, demurrer, or indictment, or for any error in any procedure in the cause, unless, in the opinion of the appellate court to which application is made, after an examination of the entire record in the case, it shall affirmatively appear that the error complained of has affected the results of the trial."

Our Supreme Court case of Wilson v. State, 109 Tenn. 167, 70 S.W. 57, decided in 1902, contains an excellent

summary of the law as then pronounced. In that case there was a non-prejudicial error in the charge and a non-prejudicial error in the statement of the trial judge to the jury respecting the time for the deliverance of their verdict. The court there said, at pages 178-180, 70 S.W. at pages 60-61:

"When the evidence is plain and convincing, and no plausible excuse can be offered, and it is apparent that an inexcusable and unprovoked crime has been committed, this court, in the interest of the public good, and in order to subserve the public welfare and preserve the peace of society, will not permit an offender to escape through mere irregularities and technicalities, nor even through errors which it can see have not operated to the prejudice and hurt of the defendant.

"The processes of the court and the manner and mode of the trial are intended to develop the main question of the guilt or innocence of the defendant, and when the guilt appears plainly, unequivocally, and beyond all doubt, this court will not reverse, unless grave errors have been committed, which would change the record, and show the defendant either not guilty, or put his guilt in doubt. While it is the desire of this court that no innocent men shall suffer for want of a fair trial, it is the duty of the court at the same time to see that no guilty one shall escape through a mere irregularity or technicality that does not and can not affect the merits, which in every criminal case is the guilt or innocence of the accused.

"This is the doctrine voiced by the general assembly as early as the act of 1809, and kept upon our statute

books continuously since for nearly 100 years, and now embodied in section 6351 of Shannon's compilation, as follows: 'No judgment, decision or decree of the inferior court shall be reversed in the supreme court unless for errors which affect the merits of the judgment, decision or decree complained of.'

"The same rule has been repeated and reiterated from time to time by this court.

"In the case of Isham v. State, 1 Sneed, 111, the court, speaking through Judge Caruthers said: 'The day is past for rescuing the guilty by mere technicalities.'

"In the case of Hale v. State, 1 Cold., 167, 78 Am. Dec., 488 the same judge said: 'The inclination now, both of the legislature and the courts, is not to screen the guilty by artificial and unmeaning rules and distinctions, but to see that the law is enforced against the guilty.'

"In the case of Wallace v. State, 2 Lea, 30, Judge Turney said: 'While the courts as strictly now as at any time in the history of the jurisprudence of the State adhere to technicalities when they involve or contain principle, yet when they are empty and without reason, and tend to defeat law and right, they are no longer regarded.'

"In the case of State v. Staley, 3 Lea, 565, Judge Freeman said: 'The day for escaping the consequences of crime on mere technicalities, not going to the protection of essential right, has gone by, and violators of law had as well accept the fact, and act accordingly.'

"In Woods v. State, 14 Lea, 460, Judge Freeman said:

'The courts in this enlightened age ought not to be asked to put on judicial spectacles in order to darken or distort the meaning of language. The age of all this is past.'

"In the case of Glidewell v. State, 15 Lea, 133, Wilson, special judge, said: 'We will uphold all technical rules that subserve the honest end of protecting the just rights of prisoners to a fair and impartial trial under the constitution and the law. We will not enforce trivial ones, *not the mandate of the constitution or of the statutes,* (emphasis added) which are of use and can be of use alone to enable the guilty to escape or to delay the sentence of just punishment.'

"In the case of Givens v. State, 103 Tenn. 650, 55 S.W. 1108, Judge Beard said: 'There is a growing inclination on the part of this court, repeatedly announced, to escape from the embarrassments of technicalities that tend to defeat law and rights.'

"We only wish to add, where guilt is clearly established and the merits have been reached beyond all doubt, there will be no reversal, except for substantial errors which deprive the defendant of some constitutional or legal right."

It seems fair to say that these early cases did not mean to be laying down an iron-clad rule that any error relating to a constitutional right violation could never be deemed harmless. It seems accurate to say that they were pronouncing against the application of the rule to act as a deprivation of any substantial right. Note that the court said "some constitutional *or legal* right" (emphasis added) in the *Wilson* case. And in the quote from Glide-

water v. State, the pronounced interest of the court was "protecting the just rights of prisoners to a fair and impartial trial under the constitution *and the law.*" (emphasis added) There was no court intention manifested to put constitutional rights into a unique category different from any other positive legal right.

In Harness v. State, 126 Tenn. 355, at pages 367-368, 149 S.W. 911, at page 912, decided in 1912, our Supreme Court held that the failure of the trial judge to take the dueling oath was harmless error, and said:

> "This court does not reverse cases and grant new trials for errors which do not affect the merits. Such has long been its settled practice.

> "Moreover, strengthening and confirming the court in its former practice, is chapter 32 of the Acts of 1911. This act provides that no judgment shall be set aside or new trial granted by any of the appellate courts in either civil or criminal cases *'for any error in any procedure* in the cause, unless, in the opinion of the appellate court to which application is made, after an examination of the entire record in the cause, it shall affirmatively appear that the error complained of has affected the results of the trial.'

> "As said before, this statute merely enacts into law the former practice of the court, and will be enforced, unless *fundamental or constitutional* rights of parties litigant are violated." (Emphasis added.)

Note that the language used is "fundamental or constitutional rights."

The case of Hamblin v. State, 126 Tenn. 394, 150

S.W. 89, dealt with harmless errors in the nature of the failure of the court minutes to show that the special trial judge was in attendance at the time of his special election, and the failure of the clerk to sign the order showing the election of the special judge. In *Hamblin,* the court first quotes the rule as it had been previously stated in *Harness,* "* * * that no reversal would be had in any case for technical errors not effecting the merits, unless *some substantial right of the accused guaranteed to him by the statutes or the Constitution* was violated." (Emphasis added.) Then, for the first time that we have noticed in the case law, the court in *Hamblin* states the exception to the harmless error rule purely in terms of constitutional rights, to wit (at page 400, 150 S.W. at page 90):

"* * * We have said in numerous cases, both written and oral, that this statute must be given effect, unless it invades some constitutional right of the accused."

The Tennessee Supreme Court clearly departed from the "no harmless error if constitutional violation" in the case of State v. Green, 129 Tenn. 619, 167 S.W. 867, in which the judge, without a jury, levied a fine in excess of the $50.00 constitutional maximum. The fine levied was $100.00, the statutory minimum, so the court held that this was harmless error since the fine could not have been made less. However, the later cases of Johnson v. State, 152 Tenn. 184, 274 S.W. 12, and Upchurch v. State, 153 Tenn. 198, 281 S.W. 462, dealing with the same question, take the opposite view.

In Vinson v. State, 140 Tenn. 70, 203 S.W. 338, decided in 1918, the indictment charged a particular act

of statutory rape and other acts were shown. The court held that it was error not to require the State to elect on which offense it sought a conviction, and could not be treated as harmless because it "immediately touched constitutional rights of the defendant, and he is therefore entitled to a new trial." The court does not further elaborate.

In Munson v. State, 141 Tenn. 522, 213 S.W. 916, the error involved was a partially oral charge to the jury in a felony case in violation of statute law. The court applied the harmless error statute and did not reverse. It said, however, inter alia:

> "* * * Of course, there may be such violation or disregard of some constitutional right of the accused, not affecting the merits, that would induce the court to order a new trial; but it is difficult to see how one who is guilty of the offense of which he has been convicted can justly complain at errors in procedure which had no direct or remote relation to the judgment rendered against them.
>
> \* \* \* \* \* \*
>
> "* * * But it is conceivable that errors might be committed, notwithstanding the act, for which a reversal would have to be had. But under the facts of this case we are compelled by the act to affirm it."

The constitutional right to have a jury determine both the law and facts of the case, [Art. 1 § 19, Constitution of Tennessee], has been presented in the context of the harmless error proposition in several Tennessee cases. In Ford v. State, 101 Tenn. 454, 47 S.W. 703, decided in 1898, there was positive error in the charge and "may

have been prejudicial" so was stated to be reversible error. The Court, referring to older cases dealing with charges on this point of law, said that they were not reversed because there was no prejudice. "The law, therefore, remains that where no injury could have resulted to defendant, it is not reversible error," said the Court in this case. This was followed in Stroud v. State, 159 Tenn. 263, 17 S.W.2d 899, wherein the court said:

"The trial judge failed to instruct the jury that they were the judges of the law as well as of the facts, and a special request was tendered for an instruction in this regard. We cannot conceive of any prejudice resulting to the plaintiff in error from this omission, in view of the absence of any reasonable controversy as to his guilt or as to the merit of the prosecution. Ford v. State, 101 Tenn. 454, 47 S.W. 703."

But in 1956, in the case of Dykes v. State, 201 Tenn. 65, 296 S.W.2d 861, on this same question, our Supreme Court held that the error could not be held harmless because the charge was a violation of the constitutional rights of the accused. The Court mentions *Ford, Stroud, Hamblin, Vinson, Munson, Johnson,* and *Upchurch,* all heretofore discussed, (as well as Watson v. State, 166 Tenn. 400, 61 S.W.2d 476), and then says:

"As far as we can find all cases that have been reported have held, where the question was raised, that when the constitutional right of the accused was violated then that the Harmless Error Statute did not save the case."

In the case of Smith v. State, 205 Tenn. 502, 327 S.W.2d 308, the Court was dealing with error in the

nature of jury members, while sequestered, being allowed to listen to radio and view television and read newspapers to a limited extent, about which all jurors testified that they were not influenced in their verdict. The Court applied the Harmless Error Statute. No discussion of this possibly being constitutional error was made.

In Briggs v. State, 207 Tenn. 253, 338 S.W.2d 625, it was held that a statement made in the jury room during deliberation by one of the jurors that the defendant had a bad temper and would kill you if he got mad and that defendant had killed his brother, was a violation of the defendant's constitutional right to confrontation and was prejudicial error, and not harmless error, even though each of the jurors denied that the statement had any influence upon their verdict. The Court again stated the rule that a violation of a constitutional right cannot be saved by the Harmless Error Statute; but, significantly, seemed to say that such error could never be harmless, saying:

"* * * In the case of Morton v. State, 69 Tenn. 498, Judge Turney in delivering the opinion in that case said of an act of a juror of the kind that: 'Such conduct on the part of a juror is quite reprehensible, and will always prejudice the accused.' We agree with this statement of Judge Turney."

The case of Poe v. State, 212 Tenn. 413, 370 S.W.2d 488, dealt with the trial judge's failure to charge on alibi when the evidence warranted the charge. The Court said:

"Nor was the omission or error of the Trial Judge, here complained of, saved by our Harmless Error Statute

(T.C.A. § 27-117). This statute does not preclude a reversal for an error affecting the result of the trial or depriving the accused of his constitutional right to a fair trial by jury * * *"

It would follow that in neither such case could the error ever be harmless.

Sambolin v. State, 215 Tenn. 569, 387 S.W.2d 817, dealt with the erroneous introduction of evidence, as does our case sub judice; but the valid ground for objection was grounded upon statute rather than the constitution. The Court held that without the invalid evidence the evidence of guilt was so overwhelming that the jury would have convicted anyway unless it acted arbitrarily, so the error was held to be harmless. The opinion, written by now Mr. Chief Justice Dyer, says, inter alia:

> "We think this is a proper case to apply T.C.A. Sections 27-116 and 27-117. This Court has consistently held errors affecting the constitutional rights of a defendant are not saved by these statutes. In the case at bar there are errors assigned affecting the constitutional rights of defendants which have not been discussed in detail in this opinion. These errors require a decision on questions of fact which have been resolved against the defendants by the Court and jury below. The record supports the finding of the trial court on these matters.

> "The application of these statutes upon alleged errors, not affecting constitutional rights, is a matter of judgment. In a criminal case the effect of the admission of incompetent evidence upon the jury in a case where

the record, without the incompetent evidence, reflects doubt of guilt is viewed in a different light than a record where, without the incompetent evidence, there is no reasonable doubt of guilt. See Landers v. State, 157 Tenn. 648, 11 S.W.2d 868."

The *Landers* case, cited by the Court in *Sambolin,* is unequivocal authority for the proposition that the harmless error doctrine can be applied to constitutional error. That case had exactly the same question involved that our case under consideration has, to wit: whether or not the introduction into evidence of stolen goods obtained by use of an invalid search warrant against a consenting defendant was reversible error. The Court applied the Harmless Error Statute, although certainly the question was constitutional. We quote:

"Concededly these search warrants were invalid, and, even though Tarlton consented for the officers to search his premises, under the circumstances of this case, the search was illegal. Hampton v. State, 148 Tenn. 155, 252 S.W. 1007.

"In such cases the trial court should follow the practice outlined in Tenpenny v. State, 151 Tenn. 669, 270 S.W.989, and Goodwin v. State, 148 Tenn. 682, 257 S.W. 79.

"While in Irvine v. State, 104 Tenn. 132, 56 S.W. 845, and in other cases, it is held that such error is cured where the evidence is withdrawn and the jury instructed to disregard same, there is force in the argument of counsel that such withdrawal does not eradicate the impression made upon the minds of the jurors, and this practice is not to be commended. Where

there is doubt as to the guilt of the accused, and the court can see that such practice might have influenced the jury, it would not hesitate to reverse the case and remand it for a new trial.

"In this particular case, however, we have no doubt whatever as to the guilt of these defendants, and, with this testimony excluded, the jury could not have reached a different conclusion unless they did so arbitrarily, which we cannot assume they would have done. The result being that, while the trial court should not have admitted this testimony in the first instance, since he subsequently withdrew it and instructed the jury not to consider it, and in view of the fact that we are of the opinion that it was prejudicial, following the rule of practice set forth in chapter 32 of the Acts of 1911, which provides that the court shall not reverse a case for the admission of erroneous evidence, unless the court is of the opinion that such evidence was prejudicial to the defendant, we must overrule the assignments of error making this question."

The case of King v. State, 216 Tenn. 215, 391 S.W.2d 637, wherein the defendant was indicted for assault with the intent to commit murder in the first degree, tried and convicted of assault with the intent to commit murder in the second degree, a new trial granted, tried again on a charge of assault with the intent to commit murder in the first degree and this time convicted of an assault with the intent to commit voluntary manslaughter. Upon the second trial the trial judge refused to charge the jury that the defendant had been previously acquitted of attempt to commit murder in the first degree and was not on trial for that offense. This was held to

be reversible error, which could not be harmless, because this involved an invasion of the defendant's constitutional protection against double jeopardy.

In Hamilton v. State, 218 Tenn. 317, 403 S.W.2d 302, the court dealt with a constitutional prohibition against a judge presiding over any matters that he had presided over in an inferior court. The trial judge had issued the original arrest warrant while a General Sessions Judge. Mr. Justice White there said:

> "We do not dispute the State's conclusion that no prejudice to this defendant has appeared; but constitutional provisions are enforceable without a showing that a criminal defendant has been prejudiced when they are disregarded. * * *"

The latest pronouncement of our Tennessee Supreme Court upon the proposition of applying the harmless error doctrine to constitutional error is contained in McCravey v. State, 221 Tenn. 237, 426 S.W.2d 174. There the Court dealt with the refusal of a trial judge to permit the defendants to testify during a hearing concerning the voluntariness of a confession. This was held to be a denial of due process and reversible error. The Court said:

> "We cannot sustain these convictions contrary to an asserted federal constitutional right on the ground the error is harmless, unless we are able to declare a belief it was harmless beyond a reasonable doubt. Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). This we are unable to do. On this question see Munson v. State, 141 Tenn. 522, 213 S.W. 916;

Dykes v. State, 201 Tenn. 65, 296 S.W.2d 861; Briggs v. State, 207 Tenn. 253, 338 S.W.2d 625 (1960)."

The doctrine of *Chapman* can be summarized from these quotes therefrom:

"* * * We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.

　　\*　　\*　　\*　　\*　　\*　　\*

"* * * that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

The other U.S. Supreme Court case cited by our Supreme Court in *McCravey,* is Fahy v. Connecticut. In that case the court dealt, as in our case sub judice, with the erroneous admission of evidence obtained by an illegal search and seizure. The question which the court took the case for was to determine whether such evidence can ever be subject to the normal rules of "harmless error"; but the majority of the court did not reach that question because they were not convinced that the evidence admitted was harmless. The unreached question was discussed by Mr. Justice Harlan, writing for four members of the court in a dissenting opinion:

"This brings me to the question which the Court does not reach: Was it constitutionally permissible for Connecticut to apply its harmless-error rule to save this conviction from the otherwise vitiating effect of the

admission of the unconstitutionally seized evidence? I see no reason why not. It is obvious that there is no necessary connection between the fact that evidence was unconstitutionally seized and the degree of harm caused by its admission. The question of harmless error turns not on the reasons for inadmissibility but on the effect of the evidence in the context of a particular case. Erroneously admitted 'constitutional' evidence may often be more prejudicial than erroneously admitted 'unconstitutional' evidence. Since the harmless-error rule plainly affords no shield under which prosecutors might use damaging evidence, unconstitutionally obtained, to secure a conviction, there is no danger that application of the rule will undermine the prophylactic function of the rule of admissibility."

The very recent case of Erving v. Sigler, decided by the 8th Circuit and reported in 413 F.2d 593, is in point with the case sub judice. Erving was convicted of murder, the victim having been shot in the head with a .22 calibre gun. An accomplice testified against the defendant, and there was other evidence of his guilt. The prosecution had introduced, also, certain .22 calibre bullets which had been unlawfully seized from his home and from his car as a result of warrantless searches. Erving's counsel effectively demonstrated in cross-examination that the bullets taken from the house and car were quite commonly possessed and used by a great number of people and were not so distinctive as to definitely connect Erving with the murder weapon. The court said, in part:

"* * * In view of the Supreme Court's recent decision in Harrington v. California, 395 U.S. 250, 89 S.Ct.

1726, 23 L.Ed.2d 284 (June 2, 1969), we feel that the admission of this testimony cannot be deemed harmful in this case. Like *Harrington,* the case against Erving "was not woven from circumstantial evidence" (395 U.S. at 254, 89 S.Ct. at 1729) and it seems clear that the jury's determination would not have been altered had not this evidence been produced. As in *Harrington,* the other evidence was so overwhelming that we conclude that this state conviction should be left undisturbed."

■ Our exhaustive treatment of this question has been necessary because this court is bound by the holdings of the Tennessee Supreme Court, and we deemed it necessary to examine them in depth. Clearly, both a state and a federal constitutional question is involved in Tennessee when an unreasonable search and seizure is conducted. We can satisfy the United States Supreme Court rule of *Chapman* by holding that we are satisfied beyond a reasonable doubt that this error was harmless. We have a clear precedent in Tennessee for applying our harmless error statute in this situation in the case of Landers v. State, supra. We find no compelling reason, in precedent or logic, to decline to do so because the foundation for the harmless error is constitutional.

We affirm this conviction.

DWYER and OLIVER, JJ., concur.